The Chancellor.
1. The first objection taken to the. *352 judgment in this case is, that the action was misconceived; and that upon the pleadings and the finding of the jury, there appears to be no cause ot action.
If the contract of affreightment was dissolved, and at an end, by the demand of the tobacco by the owner, and the refuga] hy the master to deliver it, the action ought to have been trover: Instead of which the declaration is upon the bill of lading, and admits the contract to be still valid and subsisting. The charge is for nonperformance of the contract. The first count charges a promise to convey the tobacco, in the very words of the bill of lading, and that the. defendants below received the goods on board, and though a reasonable time bad elapsed, they did not safely convey and deliver the tobacco at the place of delivery, but through the mere carelessness, negligence, and improper conduct of the defendants, the goods were lost. The whole gravamen in this count is loss of the goods by negligence; and what is the answer of the jury to this charge ? They find that on “ the twenty-first day of September, in the year 1813, in consequence of a violent storm and freshet, the schooner was sunk at the wharf, at Richmond, without any fault or negligence of the defendants below, or their agents, and that the tobacco of the plaintiffs on board, ■yvas wholly ruined and spoiled.” This is a full and perfect acquittal of the defendants from the cause of action laid in the first count of the declaration.
The second, and only remaining count, is a mere repetition of the first in more general terms. It states that the defendants assumed to receive, carry, and deliver the goods, as aforesaid, and to take due and proper care of them while ia their custody, yet through mere carelessness, and negligence, the goods were wholly lost. This charge received, of course, the same answer. Now, it is utterly inconceivable to me how a judgment can be rendered for the plaintiff upon such a charge so entirely refuted. The recovery must be secundum allegata et probata. The judgment must correspond with the pleadings and proofs. If we are at liberty in this case, to resort to a fact found by the jury, viz. that on the 16th of September, the agent of the plaintiffs below demanded the tobacco, and that thp master of *353 the vessel refused to deliver it, unless half freight Was paid; and if we are at liberty upon that fact to proceed to a course of reasoning and decision in favour of the owner, then we should have been equally at liberty to do it, if there had been no declaration. The fact so found has no manner of application or reference to the charges contained in the declaration, and unless we mean to destroy all the utility and sense of pleading, and to allow a party to declare for one cause of action and to recover for another, we cannot allow thejudgment in this case to stand.
In the case of Hunter v. Prinsep, (10 East, 378.) the owner sued the ship owner for the proceeds of wrecked goods, and the defendant set up a claim for a pro rata freight The two first counts in the plaintiff’s declaration were upon the bill of lading, and Lord Ellenborough observed, that the plaintiff could not clearly recover upon those counts, because they contained an express exception of perils of the sea, and they were the very perils by which the loss of the voyage was occasioned. So in this case the loss was by the peril excepted in the bill of lading. It was by a sea peril, without negligence ; so there is no cause of action under the bill of lading.
The attention of the Supreme Court was never called to ihe application of the finding of the jury to the charge ; and probably the declaration was never presented to them. If it had been, it would have been impossible for them to have rendered a judgment for the plaintiffs, because the verdict destroyed the cause of action. How this point came to be omitted in the argument in the Supreme Court I do not know. The argument below was upon a case made. That case was, afterwards turned into a special verdict, and the question before us arises upon the special verdict, in which we cannot avoid comparing the verdict with the declaration. Nor do I think, that this case comes within the rule that an objection not taken in the Court below cannot be taken here. That rule was only intended to be applied to objections that the party maybe deemed, by his silence t© have waived, and which when waived, still leave the merits of the case to rest with the judgment. But if the foundation of the action has manifestly failed, we cannot, without *354 shocking the common sense of justice, allow a recovery to stand. Suppose the declaration in this case had been for an assault and battery, or for slander, and the jury had found the defendant not guilty, but had further found that the defen¿[ant owed the plaintiff on a promissory note, could we jlave affirmed a judgment for the sum due on the note ? This would be too great an absurdity to be endured; yet the present case is very nearly equal to it, for the plain tills declare against the defendants for negligently keeping goods by which they were lost, and the jury find that they were lost by a storm, without any negligence. They further find a demand and refusal to deliver the goods, and upon that demand and refusal, (though no part of the charge,) the plaintiffs, after finding themselves defeated in their charge of negligence, now seek to recover.
If it should be said, that the first count in the declaration also mentions, that though a reasonable time had elapsed after the receipt of the goods, they were not delivered, the answer is, that the mention of the lapse of a reasonable time was not by way of charging the defendants with fault by that delay : it was mentioned as merely introductory to the charge of carelesness and negligence in keeping the goods. Besides, the special verdict shows, conclusively, that the delay was no fault of the defendants, for it states, that they made ineffectual efforts to get out of the Chesapeake, but it was found to be impossible, without capture, and the vessel was of necessity driven back to Richmond. The whole complaint now is, that the goods were not restored to the plaintiffs, free of freight, when they were demanded, about five days before the storm. This, I again repeat, is no part of the declaration, and, consequently, no part of the cause of action-.
Here I might rest the cause, but, as I cannot foresee with what force this objection may press upon the minds of the Court, I will next proceed to consider, whether the plaintiffs are entitled to recover the value of the tobacco, even in any form of action that might have been suited to - the case.
2. To entitle the plaintiffs below to demand the goods free ■of charge, and to make the defendants responsible for the *355 subsequent fate of the goods* even though lost by perils of the sea, there must have been an end of the contract of affreightment. It must have been in judgment of law dissolved. On no other ground could the plaintiffs have been entitled to their goods without the payment of freight, and on no other ground could the defendants have been responsible for a loss by a danger of the sea. We are to bear in mind, that “ the dangers of the seas” were excepted in thg bill of lading, dnd that the goods were lost, as the verdict states, £< without fault or negligence, in consequence of a violent storm and freshet.” As long as the contract was in force, the defendants, if otherwise faultless, remained in perfect safety under its protection, and were not to be affected „ or injured by storms and inundations. The plaintiffs, on the foot of the contract, had no right to reclaim their cargo without a tender of the freight. Any delivery short of the port of destination must have been a matter of consent and agreement, and not of strict obligation. It is well understood in the English law, and our own, that it is not in the power of one only of the parties to rescind a contract s Being mutually binding, it requires mutual consent to dissolve it. The one party had no right to tender the cargo, nor the other to demand it, until the contract had been fulfilled, unless, indeed, the demand was accompanied with the offer of the entire freight. The one side had an interest in the conveyance of the goods, and the other in the payment of the freight, and the obligation to perform in the time and mode provided, was reciprocal. The plaintiffs, then, had no right to demand the goods at the time they did, without the payment of the whole freight, unless the contract was at t_h.e time, in judgment of law, dissolved, and each party entirely released. The case, then, resolves itself into this simple point, was the contract of affreightment dissolved by all, or any of the events stated in the special verdict, at the time of the demand ? I think not; and it appears to me, that neither by the law of England, nor by the general maritime law of Europe, nor by the principles of equity and good conscience, were the two Lorillards entitled, at the time they did, to dejnand the tobacco; and throw the subse ' *356 quent loss on the defendants, wi'hout the payment or tender of their stipulated freight.
1. It is a general, and an acknowledged rule, that the voyage must be performed according to the contract, before the ship owner or master can demand his freight. The conveyance and delivery of the cargo is a condition precedent, and must be fulfilled. A partial performance is not sufficient; nor can a partial payment be' claimed, except in special cases. But if the delivery be prevented by the act of the shipper, or if he dispense with it, the master may then demand his whole freight. So, if there be a voluntary acceptance at an intermediate port, a rateable freight may be demanded. (Osgood v. Groning, 2 Campb. N. P. 466. Luke v. Lyde, 2 Burr. 882. Cook v. Jennings, 7 Term Rep. 381. The Hiram, 3 Rob. Adm. 180. Hunter v. Prinsep, 10 East, 378. Richardson v. Mutual Ins. Co. 6 Tyng, 102. Liddard v. Lopes, 10 East, 526. Vide, also, 9 Johns. Rep. 19. 5 East, 322. 1 Campb. N. P. 451.) These are points not now in question, and it is not contended, that the defendants below were entitled to demand their freight in whole, or in part, when the demand was made upon them for the redelivery of the goods. It is only contended by the defendants below, that the contract was still in operation, and that they had a right to retain the goods, and wait for an opportunity to fulfil the contract; and that if the other party, elect-, ed to receive back their goods, they were then bound to pay the freight. The reason is, that the blockade of the mouth of the Chesapeake by British ships, did not dissolve the contract, but only suspended, for the time, its performance, and the defendants had a continuing and subsisting fight to-wait until they had an opportunity to go to sea. This was a right they had, and it was the only means of indemnity for the time, labour, and expense, already bestowed upon the contract. The plaintiffs could not deprive them of this, right without their consent, or without tendering to them the stipulated compensation.
There is no doubt, that if a voyage be broken up, after its Commencement, by'war, or interdiction of commerce with the place of destination, the contract is dissolved, and the "freight gone;, This was the case in Liddard v. Lopes, *357 (10 East, 526.) where sailing orders were recalled by the convoy, and the voyage broken up, because the place of discharge had become occupied by the enemy, and it became unlawful to go there. So, if the voyage be broken up and lost by capture upon the passage, so as to cause a complete defeasance of the undertaking, notwithstanding there was a subsequent recapture, as in the case of The Hiram, before Sir William Scott. (3 Rob. Adm. 180.) So, if there be a blockade of the place of destination so that a delivery becomes impossible, and the vessel returns with her cargo to the port of departure, the voyage is defeated, and the freight not earned. (Scott v. Libby, 2 Johns. Rep. 336.) But in these cases there was an actual loss and abandonment of the voyage by the master, or the delivery of the cargo became unlawful or impossible. They have no application to the case where there was no such insurmountable impediment, or no such abandonment of the voyoge,butthe parly was ready and, as it were, in service all the time, waiting for the removal of an obsticle which was only temporary and transient in its nature. The English decisions and our own do not go further than in the instances I have mentioned, and, cer-lainly, they ought to be confined to the limits within which .they have moved ; and, even then, they differ from the marine law of other epuntries, as I shall presently show. In " the present case, it is found by the jury, that when the vessel arrived at Hhmpton Roads, it was impossible to go to sea without being captured, that she put back to Norfolk from necessity, and that after remaining there for a time, she was obliged, from the same necessity, to run up Jameses river, and return to Richmond, from whence she had departed. Here was clearly no relinquishment or breaking up of the voyage on the part of the master. He only retired as fast as the impending danger pressed upon him.
The case of an embargo is a very strong case in the English law to show that a temporary impediment to a voyage does not, of itself, wprk a dissolution of the contract of affreightment; and as long as the contract remains in force, it will undoubtedly be conceded, that neither party can, by his own act or volition, dissolve it without the assent of the other. It is well settled that an embargo does ®ot dissolve *358 any maritime contract. It is only a temporary restraint which suspends for a time its performance, and leaves the rights of the parties, in relation to each other, untouched. This was so decided by the Supreme Court of this state, in M‘Bride v. Ma. Ins, Company, (5 Johns. Rep. 308.) and by the Supreme Court of Massachusetts, in Baylies v. Fettyplace, (7 Tyng, 325.) and it is also a clear rule in the Eng* lish law. The case of Hadley v. Clarke, (8 Term Rep. 259.) merits a particular attention, and is quite decisive, not only of this particular point of the embargo, but, as I apprehend, of the whole merits of this case.
The facts in that case were, that in June, 1796, the plaintiff shipped on board of a vessel, of which the defendants were owners, a quantity of goods, on a voyage from Liverpool to Leghorn, with liberty to proceed to Falmouth, for convoy, and the defendants undertook, for a stipulated freight, to deliver the goods at Leghorn, the dangers of the seas only excepted. The ship sailed with thg goods for Falmouth to join convoy, and arrived there on the 30th of June, 1796 ; and during her stay there waiting for convoy, an embargo was laid on all ships bound to Leghorn, which had then recently fallen into possession of the troops of the French republic, and the embargo was to continue until further orders. The embargo was laid by an order in council, of the date of the 27th of July, 1796, and by another order of the 23d of August following, the vessels embargoed, had liberty to proceed from the ports where they then were, to the ports in which they were laden, on giving security that they would do so, and that on arrival at the ports where the goods were laden, they were permitted to land and store their cargoes to, and for the use of the owners. In June, 1798, (being two years after the vessel had arrived at Falmouth) and while she was still there, the defendants gave notice to the plaintiff that they should act agreeably to these orders in council, and bring the goods back to Liverpool, unless the plaintiff directed otherwise. In August, 1798, the embargo still continuing, the ship, without any consent from the plaintiff, returned to Liverpool, and complied with the requisitions of the government order, and the goods were then disposed of' *359 by an arrangement between the parties, without prejudice to their rights under the contract of' affreightment. On the 24th of October, 1798, being two months after the goods arrived at Liverpool, the embargo on ships bound to Leghorn was taken off, as Leghorn had been recovered from the French by the Auslro-Russian army.
The plaintiff then sued the defendants for a breach of contract in not carrying their goods; and I believe it will be admitted by every person, that those defendants had as good an excuse for not performing their contract, and as good ground to contend, that the contract was dissolved by the two years embargo, as the defendants below could have had in the present case.
On the part of the plaintiff in that case, it was urged, that the embargo was not like a general, unlimited prohibition, but it was only a suspension of the contract, and when that suspension ceased, the liability to perform attached. It was considered as of mischievous tendency to hold that the embargo dissolved the contract; and if it did not dissolve the contract when first laid on, no continuance of it afterwards could have that effect, for no line could be drawn as to the precise time when it first began to have that operation.
The other side contended, that the performance was rendered illegal by an act of the state. That the party had waited a reasonable time, (two years) after the embargo was first laid ; and that from the nature of the occasion of the embargo, viz. The possession of Leghorn by the enemy, it might have continued during the war.
The Court of IC. B. at the head of which was Lord Kenyon, held, that both parties were innocent, and that, whatever their decision might be, one side must suffer, and that neither party being in fault, the case must be determined upon strict principles of law. They admitted, that the embargo was a legal interruption of the voyage; but that it would be very injurious, if a temporary embargo were to put an end to such a contract, because it must then have the effect of putting an end to all contracts for freight, and for wages. That, no line could be drawn as to the length of time in which an embargo would put an end to the contract, and that, in fact, the temporary interruption of a voyage by *360 an embargo did not put an end to the contract; that aft-interruption by a ship being driven out of her course did not 5 and that ships had frequently been driven from England to Ireland, and even, by the violence of winds, to Denmark, w}lere they had been obliged to winter, and yet the contract 0f affreightment remained. That, in short, the defendants absolutely engaged to convey the goods, the damages of the seas only excepted, and they coaid not set up any other excuse.
Now, if this case be the strict English law, (and the case has never been questioned, but it has even been referred to by the Courts in Massachusetts, and in this state, as sound) then most certainly the contract before us was not dissolved, because some British frigates happened to i lay, for a few months, across'the mouth of the Chesapeake. This was an impediment extremely uncertain in its duration. Some other naval object, or even a storm might have opened a passage for the defendant’s vessel to have gone out with her cargo. If the contract of affreightment was dissolved by the presence of those British ships, then, as was truly said by the English judges, in the-case just cited, the contract for wages between the master and crew of the vessel was equally dissolved, and the claim for wages perished with the claim for freight. If the contract was dissolved in September, when, the Lorillards demanded their tobacco, it must have been dissolved, in March, or February preceding, for the same cause for dissolving it then equally existed; as was said by Lord Kenyon, it is impossible for us to draw the line as to the precise time requisite to destroy the contract. And if dissolved in favour of one party, it was as ' much so in favour of the other, and the master might have left the tobacco at the very first harbour he was compelled to enter, as Norfolk. He was not bound to bring thetobacco back to the place at which he received it. He was only bound to see it safely landed and stored- wherever he happened to be when the contract was thus dissolved. We cannot maintain that he was bound to carry the tobacco one mile beyond the first safe port, without admitting the contract of affreightment to be in force. If that contract was annulled, there w-as no-relationship between the parties, a.nd, the master was- *361 under no obligation to transport any where. He was only bound, upon principles of natural justice, to keep the subject safely, until he could land it in some safe place, and give notice of it to the other party. To such consequences are we driven, by adopting the principle, that the enemy’s ■ships at the mouth of the Chesapeake, rendering it impossible for the defendant to pass them, dissolved the contract contained in the bill of lading.
2. But, if we pass from these English decisions to the general marine law of Europe, we shall find that the right of the defendant to a rateable freight, when the tobacco was demanded, to be universally established.
In the case of Luke v. Lyde, (2 Burr. 882.) Lord Mansfield, after referring to, and citing the maritime ordinances and writers of various commercial nations, adopted the rule laid down by those authorities, that if a ship becomes disabled in the course of her voyage, the master, (if in no fault,) though he neither refits his own ship, nor procures another, was entitled to freight, pro raía itineris, i. e., in proportion to the voyage he had performed. I do not cite this case, as being applicable to the present one, and I am sensible that the English judges have been reluctant to introduce the rules of the marine law on this subject of freight. But I refer to this case as evidence of the force with which the superior equity of the marine law struck the mind of Lord Mansfield ; and it may be here observed, that the courts in this country have adopted the rules of the marine law much more liberally than the English judges, since the time of Lord Mansfield, have been inclined to do. I could give numerous instances of this in the decision of the federa] courts, as well as in those of the several states. Thus, for instance, in the case of Sims v. Jackson, (1 Peter’s Adm. 157.) Judge Washington allowed the wages of a seaman who died on a voyage, by adopting a rule in the laws of Oleron; and in Morgan v. The Insurance Company of North America, (4 Dallas, 455.) Ch. J. Tilghman of the Supreme Court of Pennsylvania allowed to the ship owner his freight on a voyage from Philadelphia to Surinam, though the government of that country would not permit the cargo to be landed, and it was broug'nt.back to Philadelphia. He founded his *362 decision on one of the marine ordinances of Lewis XIV. as being evidence of the general marine law, which, in" that case> thought to be ipoat reasonable.
By the French ordinance of the marine (liv. 3. tit. 3. Fret. art 15. and Valin, h. t. p. 657. Pothier, Charte Partie, No. 69.) jg provided, that if it should happen, after a voyage is commenced, thstt commerce be prohibited by war or otherwise, with the country to which the vessel is destined, and the ship is thereby obliged .to return with its lading, the ship owner shall be entitled to the outward freight. This is, in fact, dividing the loss of the labour and expense of the voyage, as to freight, between the shipper and the ship owner. It is the rule which the master of the schooner applied to himself in the case before us.
The rule I have cited applies to the interruption of the voyage after, its commencement; and in that respect, it, is analagous to the present case, for the blockade of the Chesapeake did not exist when the bill of lading was signed, Which was only six or seven days before the vessel sailed. And it does not appear, that even then the blockade had commenced. But the rule of the French law which applies still more closely to this case, is that which declares, that nothing but occurrences which prevent absolutely the execution of the contract, will dissolve it; and that those oct currences which only retard the execution of it, do not discharge it, and the parties must wait until they .can execute it. Thus, by the 8th article of the ordinance, on charter parties, (Chartes Parties, art. 8. Valin, ibid. and Pothier, h. t. No. 100.) it is provided, that if the port to which the vessel destined be only closed, as by an order of the prince, or by a blockade, or if the vessel he arrested for a time by vis major, both parties are bound to wait for the opening of the port, by the raising of the blockade, or the liberation of the vessel, without damage on either side. It is further provided, (art. 9. ibid, and Poither, ibid. No. 101.) that the merchant, during the time of such interruption or detention, may unload the cargo at his own expense, on condition, however, that he shall afterwards reload, or indemnify the master of the vessel. This last is considered as a most equitable provision. It may be the interest of the owner to *363 unload, as if there be danger that the cargo will spoil in remaining too long upon the water, if the detention should continue a long time; or it may be uselessly exposed to the perils of the sea, or to embezzlements of the crew, and the master can have no interest in opposing it, upon the above terms. The indemnity to the master, if lie does not reload, say these French commentators, consists in paying the freight, the same as if it had been reloaded.
There is one case in which the shipper is considered by the French authors, (Valin, Com. on Art. 9. Pothier, No. 102.) as absolutely discharged from reloading, or indemnifying the master, and this is when the cargo consists of such perishable articles, as fruit fur instance, which cannot be preserved during the time that the detention continues. The reason why no indemnity or freight is to be paid in that $ase, is, that considering the nature of the cargo, the detention absolutely breaks up the voyage, and prevents the execution of the contract. The cargo cannot endure the delay. A similar decision was made, for the same reason, by Sir Wm. Scott, in the case of The Isabella. (4 Rob. 77.) A Swedish vessel with a cargo of fish was detained by an embargo after the voyage was commenced, and he held, that the master was not entitled to freight, as it was impossible to fulfil the contract, because the cargo could not support the delay of the embargo.
I need not enlarge further on these distinctions, or on the just reasoning of these classic writers on maritime law. I have said enough to show, that according to these authorities, the present contract was not dissolved, and that the Lorillards were bound to wait until the master was enabled to perform his voyage, or else to indemnify him for the loss of his freight, if they wished to reclaim their cargo.
By the laws of Oleron, (art. 4.) if a vessel in the course of her voyage, becomes unfit to proceed, the master may repair the vessel, if he can readily do it, or he may freight another ship. But if the shipper requires his goods, the master may deliver them if he pleases, on the shipper paying his rateable freight and salvage. These ancient laws óf Oleron thus allowed a rateable freight when the voyage was necessarily interrupted, and the owner wished to re *364 caive back his goods. And if we go still further back, to the venerable code of the Consolato del Mare, we shall there meei-' with several cases in which the shipper voluntarily receding from his contract, may be supposed to have consuited his own interest. Thus (ch. 80. in the Consulat par Boucher,) if the captain of a ship has been paid his freight, and the shipper then withdraws his goods through fear, (as for instance, of pirates,) or on account of intervening obstacles, the master is not bound to restore the freight, but he must wait from two months to two months, until the danger is over, and then convey the cargo. So, (ch. 84.) if the goods are on hoard, and the voyage has commenced, and the merchant then wishes to withdraw his cargo, he is bound to pay the whole stipulated freight. For, it is observed, if the master is hound to fulfil his engagement with the shipper, the shipper is equally bound to fulfil his engagement with the master. And the reason, says the Consolato, (ch. 82.) for allowing freight in the several cases in which the merchant voluntarily recedes from the shipment, is because the master of the ship has sustained damages in the provisions and wages of the crew, and in other expenses» One cannot but admire, says Boucher, (note to ch. 85.) the spirit of justice which dictated these decisions of the Consolato, and which are the more astonishing, when we consider that this compilation was the work of a barbarous age.
Roccus, (de Nav. n. 54.) also states, that if a voyage be begun, and, by accident, the goods cannot be carried to the port of destination, freight is payable for the part of the voyage performed, and be cites Hévia and Straccha for the same rule, and it is no more than what is laid down in all the foreign ordinances.
Jacobson, a Danish lawyer, has recently compiled a work on the sea laws, in which he has collected the marine law of Eur ope, as declared in the ordinanc es, and by the jurists among the Italians, French, English, Dutch, Germans, Danes, and Swedes, and he lays down the same doctrine in various parts of his work. (See p. 217. 276, 277.) But without undertaking to cite passages, I will only mention a recent decision which he reports, (p. 295. of Frick's Translation,) and *365 which appears to me to be very much in point. In April, 1813, while Hamburgh was in possession of the Russians, a merchant at Hamburgh, chartered a ship to convey a cargo of grain to London. The vessel proceeded a few miles ■down the river Elbe, and was then interrupted in her voyage by the French and the Danes, who occupied different sides of the river, and compelled her to return. The grain becoming heated, the cargo was unloaded by the owner of the cargo, and who required the master to discharge- it. The master claimed the whole freight, under the Danish and the Hanseatic law, as the voyage had been commenced, and been defeated by a vis major. The merchant tendered only one eighth of the freight, and insisted, for various weighty reasons, that the law giving freight did not apply. The Court at Altona awarded to the master half freight, and ecc <pquo et bono, as the judgment expressed it, or, according to equity and good conscience.
The master, in the present case, had certainly a much better claim to freight than the Hamburgh master, for the flour could not sustain a delay in the one case, whereas the tobacco in the other might have well endured it; and it appears to me, that if the master in the case before us is to be held responsible for the whole loss of the cargo, because he refused to surrender it without some compensation, we shall depart from the usages of all the European nations.,
My opinion, in this case, is, that the contract was not dissolved when the Lorillards demanded their tobacco, and that the master was entitled to retain it, and wait for the removal or dispersion of the British force, so. as to enable-him to perform the voyage, and earn his whole freight. And when he offered to surrender the cargo on the payment o.f half freight, he acted with a reasonable spirit of accommo.dation, and stood upon a principle of equity which pervades, the maritime law of Europe.
These ordinances of Europe_, both ancient and modern, and these various and distinguished jurists to whom I have referred, would not have spoken in such uniform language, if they had not spoken the common sense of mankind. It certainly strikes the mind as reasonable and just, that a ship owner who employs his ship and crew at much expense, and *366 for months together, in the service of another, for a stipulated price, and who is interrupted in the performance of his contract, without his fault, by an invincible obstacle of á temporary nature, should be allowed either to wait for the removal of the obstacle, so that he might earn his freight, or e;se to receive some equitable allowance for his intermediate service. Both the pne and the other were denied in this case by the judgment of the Supreme Court, and I am, accordingly, of opinion, that the judgment ought to be reversed.
Jmswry nth. ■
This being the unanimous opinion (a) of the Court; it was thereupon ordered and adjudged, that the judgment of tii'e Supreme Court be reversed, and that the plaintiffs in error be restored to all things which they have lost thereby ; And it is further ordered and adjudged, that the defendants in error pay to the plaintiffs in error, for their costs and charges in and about prosecuting their writ of error, in this Court, and that the record be remitted, &c.
Judgment of reversal.

 Though the whole Court were for the reversal, yet, a few of the members confined their opinion to the first point; a great majority, however, concurred with the Chancellor, generally, that the judgment ought to be reversed on both points.