# THE SPARTAN.[1]

## CROSSLEY v. FABBRI and another.[1]

*(District Court, S. D. New York. July 24, 1885.)*

1. DEMURRAGE—BLOCKADE OF PORT OF DESTINATION—CONSTRUCTION OF CHARTER-PARTY—CUSTOMARY DISPATCH—CASE STATED.

The charter-party of the ship S. provided for a voyage "from New York to Arica, Peru, with the privilege of a second port in Peru not north of Callao; charterers to be allowed 'customary dispatch' for discharging the cargo after the captain reports the vessel in the berth ready to * * * discharge the cargo. * * * Should the port of Arica be blockaded, and the vessel not be able to get into that port, the vessel is to proceed to the next nearest open port to discharge her cargo." On arrival at Arica on the fifth of April, that port was found to be blockaded, and the vessel was ordered by the agents of the charterer to Callao, which was then open, but was blockaded the day before the vessel arrived there. The agents thereupon directed the vessel to go to Ancon, 10 miles north of Callao, a place which had never before been made a port of entry, and which had no facilities for discharging cargo, in consequence of which great delays were occasioned. When about half the cargo had been discharged, Ancon was blockaded, and the vessel went to Chancay, where there was further delay, and a little more discharge of cargo before that port also was closed. After further hindrances, the discharge was finally completed on the twenty-fifth of August at Arica, where the blockade had been raised. Libelants claimed that "customary dispatch," in general, on the coast of Peru was such that the S. should have been discharged at Ancon by May 12th, whereas her discharge was not completed at Arica until nearly 125 days later, for which demurrage at the rate of £15 per day was demanded. *Held*, that the expression "customary dispatch," in unloading, is the dispatch customary at the place of discharge. At the extemporized ports of Ancon and Chancay there was no custom. As, in using the phrase "at the next nearest open port," the parties could not reasonably have had in view any such places as Ancon or Chancay, the "customary dispatch" of large ports, such as Arica or Callao, could not be exacted in this case at new and extemporized ports, which were substituted by necessity, and not from choice, as places of delivery, to prevent the defeat of the voyage, and that the obligation of the consignees, as respects discharge in those places, would be that of reasonable diligence only.

2. SAME—WAIVER OF PROVISION IN CHARTER—RESULT IN THIS CASE.

As the consignees designated Callao, 600 miles north, for the place of discharge after Arica, and the captain of the S. acquiesced, *held*, that the provisions of the charter as to the "next *nearest* port" had been waived. There was no provision in the charter for a substituted port in case the "second port" should also be blockaded. *Held*, therefore, that upon the blockade of Callao the situation became the same as if Callao had been the only port of discharge named in the charter, with no reference to the contingency of blockade.

3. SAME—BLOCKADE OF PORT OF DESTINATION—EFFECT ON CHARTER—ENGLISH AND AMERICAN AUTHORITIES.

English and American decisions reviewed as to the effect of the blockade of the port of destination of a vessel on the obligations of her charter-party.

4. SAME—UNDER FOREIGN LAW.

The obligations of the ship in such circumstances considered under the codes of various foreign nations.

5. SAME—EFFECT ON CHARTER—DUTY OF MASTER—FREIGHT—DELAY OR DAMAGE—CONTRACT TO RUN BLOCKADE.

Under our law, a blockade that prevents both parties from performing their concurrent obligations as to receipt and delivery of cargo dissolves the specific contract. If the master cannot then obtain the instructions of the ship-

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

per, he must act for the best interests of all concerned; he will receive freight or no freight, according to the beneficial services rendered, and neither party can claim damage for delay or defeat of the voyage under the original contract. Whether a specific contract among neutrals to run a blockade should be enforced in the absence of any municipal law or treaty forbidding it, *quære*.

6. SAME—DELIVERY ELSEWHERE—CONSTRUCTION OF CHARTER — TOTALLY DIFFERENT PLACE OF DISCHARGE—REASONABLE DILIGENCE.

If, on blockade of the port of destination, a delivery of the cargo is made elsewhere, it will be a question of construction whether the new place of delivery is to be deemed a mere substitute for the former, or whether the minor incidents of the charter are to be deemed superseded. Such delivery elsewhere is *pro tanto* a new contract, and, under the compulsory selection of a totally different place of discharge from the place named in the charter, in order to prevent a defeat of the voyage, the incidental stipulations of the charter, as respects demurrage or rate of discharge, will not necessarily be deemed preserved by mere implication at the substituted place of delivery. And where the circumstances make such an implication unreasonable, it will be rejected, and the obligations of each party construed to be to use reasonable diligence only in the delivery and receipt of cargo.

7 SAME—MASTER—UNREASONABLE REFUSAL.

The master, in proceeding from one port to another that lacked necessary launches for discharge, having refused to take in tow for his use a launch tendered by the charterer's agents, *held* an unreasonable refusal that barred any claim for delay until other arrangements were made.

8. DEMURRAGE ALLOWED FOR NINE DAYS.

In view of the disturbed state of affairs on the coast, *held*, on the evidence in this case, that the consignees had, in general, used reasonable diligence, with the exception of nine days, for which demurrage was allowed.


In Admiralty.

This libel was filed to recover demurrage for the detention of the bark Spartan at various ports in the region of Arica and Callao, Peru, in the summer of 1880, arising out of the blockade of the Peruvian ports by the Chilian fleets during the late war.

On the third of December, 1879, the respondents chartered the bark Spartan, under a charter-party executed by the libelant, as master, for a voyage outward *"from New York to Arica, with the privilege of a second port in Peru, not north of Callao,* on the terms following: * * * The respondents shall be allowed twenty running lay days for loading * * * and customary dispatch for discharging the cargo, commencing the day after the captain reports the vessel in the berth ready to receive or discharge the cargo; demurrage £15 per day; the cargo to be received and delivered within reach of the vessel's tackles at ports of loading and discharging; lighterage, if any, at expense of cargo. * * * *Should the port of Arica be blockaded, and the vessel not be able to get into that port, the vessel is to proceed to the next nearest open port to discharge her cargo.* * * * If second port be used, the cargo to be discharged at that port to be so stowed that it will come out of the vessel last."

The Spartan sailed from New York on the first of January, 1880, with a general cargo of provisions and lumber, being about 1,100 tons measurement and 800 tons weight. She arrived off Arica on the fifth of April following, and found that port effectively blockaded, and was ordered off by the blockading squadron. Instructions antici-

pating this blockade had been sent by the agent of the charterers by letter dated March 20th, directing the vessel, in case Arica should be found blockaded on arrival, to proceed to Callao. Callao is about 600 miles to the north of Arica, and had not then been blockaded. The Spartan, accordingly, proceeded to Callao, and arrived there on the tenth of April; but on the day before her arrival that port also was blockaded, and the Spartan was boarded and ordered away. On the 11th the captain was allowed to land for the purpose of obtaining instructions from the agents, Grace & Co., at Callao. They were unable on that day to give any directions, but on the next day they directed the ship to proceed to Ancon, which was about 10 miles to the north of Callao, where the Spartan arrived on the evening of the 12th, and reported by telegraph. Ancon was first made a port of entry by Peru upon the blockade of Callao. It had no adequate facilities for discharging such cargoes as that of the Spartan. No similar vessels or cargoes had discharged there before. On the 13th the captain received a letter from Grace & Co., and wrote to them the same day announcing his readiness to discharge. There was an old, narrow mole there, with a railroad track connecting with a warehouse about 300 yards from the beach. The Peruvian government appropriated this warehouse, in part, for custom-house uses, and all dutiable goods had to go into this warehouse. Other goods, not dutiable, could be landed on the beach, except on days when the surf rolled in too heavily, called "surf days." The Spartan came to anchor about half a mile from the shore, and the cargo could only be discharged in lighters, which had mostly to be brought from elsewhere. Grace & Co. sent four from Callao; but three were lost on the way, by capture or shipwreck, and only one came through, which arrived on the afternoon of April 20th. The discharge was commenced on the morning of the twentieth of April, in one of the three lighters previously at Ancon.

About the same time, or very shortly after the arrival of the Spartan on April 12th, a number of other sail-vessels came to Ancon to discharge on account of the blockade of Callao. The steamers of the Pacific Navigation Company also made Ancon their port instead of Callao, and they had the preference in the use of the mole and of the three lighters which were there at first. On May 11th notice of the blockade of Ancon was given, and all vessels were required to leave in eight days. On the 19th, the Spartan, having discharged 23 lighter loads, or about one-half of her cargo, proceeded, by the captain's decision, and with the subsequent assent of Grace and Co., to Chancay, 18 miles north of Ancon, where she arrived on the same day. Chancay had never before been a port of entry; there were less facilities there than at Ancon, and landing on the beach was generally unsafe. On the 27th the discharge of cargo was resumed at Chancay; but Grace & Co. were unwilling to receive the lumber there on the beach, and endeavors for a transhipment of it were mainly unsuccessful.

In all 13 lighter loads were discharged at Chancay. On the seventeenth of June the Spartan was ordered by blockading vessels to leave Chancay within 48 hours. The captain and Grace & Co. could not agree as to the disposition of the vessel. The captain took on some lumber for Iquiqui, which he intended to make his next port, but the consignees of the remaining cargo would not consent to receive it there. They agreed to receive the cargo at Salaverry, two days' sail north of Chancay. Grace & Co. desired the vessel to proceed thither. The captain refused, and went south to San Lorenzo, where he was ordered off by a blockader. He thence proceeded, on the 27th, to Huacho, where, by permission of Grace & Co., he took on board other cargo, without prejudice to the charter. On June 25th it was agreed that he should proceed again to Arica, the blockade there having been raised. After some difficulty with the custom-house at Huacho, he sailed for Arica on the sixth of July, and arrived there on the fifth of August. He commenced discharging on the following day, and finished on the 25th.

The libelant claimed that "customary dispatch," in general, on the coast of Peru was 45 tons per day for discharge of merchandise, dead weight, and 25,000 feet per day for lumber; and that the Spartan should accordingly have been discharged at Ancon in 25 days after April 13th, that is, by May 12th; whereas her discharge was not completed at Arica until 125 days later, for which delay demurrage at the rate of £15 per day, or about $8,250, was claimed.

The evidence showed that at Ancon, during the 25 working days (excluding Sundays and surf days) between April 13th and May 12th, they discharged only 14 lighter loads, on 12 different days; in the remaining five days at Ancon, they discharged nine lighter loads; at Chancay they worked nine days, and discharged 13 lighter loads; at Arica they worked 10 days, and discharged 10 lighter loads. At Ancon there were, in all, 30 working days from the day of the Spartan's arrival; at Chancay, 22; and at Arica, 14.

*Owen & Gray*, for libelant.

*Butler, Stillman & Hubbard*, for respondents.

BROWN, J. The long detention of the Spartan arose out of the successive blockade by the Chilian government of the various Peruvian ports at which the discharge of cargo was sought to be made. Upon the argument, little stress was laid upon the delay at Arica, when the Spartan came back there after the removal of the blockade. The chief complaint is of alleged long continued and inexcusable delays at Ancon and at Chancay. If the "dispatch customary" at Arica and Callao is applicable to the discharge at the extemporized ports of Ancon and Chancay, to which the Spartan went in consequence of the blockade of Arica and Callao, then the libelant is entitled to, at least, a substantial part of his demand. If the "customary dispatch" of those ports is not applicable, and only the rule of reasonable diligence applies, then a very different result will follow.

The respondents contend that the blockade of the destined ports dissolved the obligations of the charter in respect to the *rate* as well as the *place* of delivery, and that the duties of each party to the other, in the subsequent endeavors to make and receive delivery elsewhere, are not to be determined by the stipulations of the charter-party, but by the equities of the case growing out of the particular circumstances that subsequently arose, which were not contemplated by the charter, and were wholly outside of its provisions. The decision of the case, therefore, involves—*First*, the construction to be put upon the charter-party, and the conduct of the parties under it; *second*, the legal effect of a blockade of the stipulated place of delivery, and the consequent duties of the parties as to delivery of the cargo at other ports.

1. This charter was executed after the war between Chili and Peru had broken out, but before Arica was blockaded. The parties contemplated the possibility of the blockade of that port before the arrival of the ship, and stipulated that in that event the ship should go to the "next nearest open port" to discharge. They had no intention of violating any blockade. The cargo was not contraband. The object of the voyage, therefore, was not illegal even under the law of nations, still less under our municipal law. *The City of Mexico*, 24 Fed. Rep. 33; *Naylor* v. *Taylor*, 9 Barn. & C. 718. Arica was the primary port of discharge, and the provision for proceeding to the "next nearest open port" is connected solely with the blockade of Arica. Wholly independent of this clause is the further provision of the charter giving the charterer the privilege of "a second port in Peru not north of Callao." The ship, however, exacted for her benefit the condition that "if second port be used, the cargo to be discharged at that port to be stowed so that it will come out of the vessel last." The manifest object of this clause was to save the ship the double labor of shifting the cargo in discharging, which might otherwise have become necessary, if the cargo to be discharged at the second port should have been loaded promiscuously with the rest. The last clause evidently, therefore, required the charterer's option to be determined before loading. This was accordingly done, and a portion of the cargo was loaded for Callao as a second port, and so stowed as to come out last.

The ordinary meaning of the requirement of "customary dispatch" in unloading is the dispatch customary at the place of discharge. *Lindsay* v. *Cusimano*, 12 Fed. Rep. 504, 507; S. C. 10 Fed. Rep. 303; *Kearon* v. *Pearson*, 7 Hurl. & N. 388. At Ancon and Chancay there was no custom; for those places were never before ports of entry, and such cargoes had never been discharged there. If the charter had expressly stipulated for a discharge at those places with "customary dispatch," possibly the custom of the ports on the coast where similar cargoes were usually discharged might be held to have been intended by the parties, and the clause, therefore, have been so interpreted; since otherwise the whole clause would have been futile.

But this charter did not mention Ancon or Chancay, and it did not contemplate a discharge at places of such a character. It mentions Arica, "or the next nearest open *port*," and a second *port*, to be named by the charterer, not north of Callao. The only "ports" that can be reasonably supposed to be referred to in the charter are ports known to commerce, existing at the time, and therefore having either a custom of their own, or facilities for the "customary dispatch" of the coast. The place named as a "second port" was Callao. That port and Arica are among the largest and best known ports in Peru, and have the best facilities for discharge. In providing for "customary dispatch" with those ports primarily in view, the parties in effect stipulated for what would ordinarily be only usual diligence in the discharge. Is it a reasonable construction of this charter to hold that in providing for a discharge "at the next nearest open port," in case Arica was blockaded on the ship's arrival there, the parties intended to stipulate that the same rate of discharge that was practicable at the best ports in Peru should be obligatory at places that up to that moment had never been ports at all, had no "custom" of their own, and had no facilities for discharge except such as were extemporized or sent thither under the embarrassments of flagrant war? I think not. Such a construction seems to me highly unreasonable, and not within any probable intention of the parties. Without such a construction the clause has reasonable scope for its operation; it should not, therefore, be held to include any unreasonable application.

If, therefore, the clause requiring "customary dispatch" is to be connected with the provision for going to "the next nearest open port," it must be construed in the ordinary way, as meaning only the custom of the port itself to which the vessel goes; so that the Spartan, in going to a place which was never a port before, and had no "customary dispatch," would take no benefit from that clause, because it would have no application, and no meaning, in reference to such places. The obligations of the consignees, as respects discharge at such places, even if the discharge there were held to be within the provisions of the charter, would therefore be those of reasonable diligence only. Upon this construction the only question would be whether the charterers' agents used reasonable diligence in discharging at the other ports to which the vessel went after the blockade of both Arica and Callao. But as the case has been chiefly argued in its other aspects, viz., as to the effect of the blockade in dissolving the stipulation of the charter as regards the place and rate of discharge after the departure from Callao, I proceed to consider it from that point of view.

2. Upon the arrival of the Spartan off Arica, that port being blockaded, the vessel, in accordance with the instructions of Grace & Co., the respondents' agents, proceeded to Callao, 600 miles to the northward. The evidence shows that there were many intermediate open ports between Arica and Callao. The captain might have insisted

v.25F,no.1—4

upon going to the "next nearest open port to Arica," and there only, to discharge the Arica cargo. But as the vessel had been loaded for Callao as a second port, and was bound to go there upon the charterers' designation, the captain had no interest to decline going to Callao to discharge the Arica cargo, instead of stopping at some intermediate open port nearer to Arica. On the contrary, the interests of the vessel were apparently promoted by going directly to Callao at once, as the second port within the charter; and it was certainly competent for the consignees to accept the Arica portion of the cargo there instead of at some port nearer to Arica, if they chose to do so. Callao was not at that time under blockade; and there is no evidence that a blockade was anticipated there sooner than at any other port nearer to Arica. The direction by the consignees to proceed immediately to Callao was therefore a proper and lawful direction, (see *Ogden* v. *Graham*, 1 Best & S. 773;) and the acceptance of this direction by the master must therefore be construed as a waiver by both parties of a strict delivery of the Arica cargo at "the *next nearest* open port," and an agreement to accept Callao instead as the next port and as a substitute for the discharge of the Arica portion of the cargo, as well as the "second port" provided for in the charter. On arriving off Callao, however, five days afterwards, that port also was found to have been blockaded the day before, so that no delivery could there be made.

In this situation I think the provisions of the charter-party as to the place of delivery must be deemed exhausted. The language of the charter requiring the vessel to go to the "next nearest open port" has reference to the blockade of Arica only; there is no similar express provision in case the "next port" should be blockaded before the discharge there was completed. Had the provisions of the charter as to the next nearest port to Arica not been waived, then, upon the blockade of the next port before completing the discharge at that port, if Arica was still under blockade, the ship might possibly still have been required to go to the next open port that was nearest to Arica. But the strict performance of this clause had been waived. The ship had sailed some 600 miles northward to Callao; the consignees had the right to have the portion of the cargo designed for Callao discharged near that port; and it would be unreasonable to hold that the captain could be required to return to the strict terms of the charter-party after they had once been waived by both, and to go back hundreds of miles to the south, to that particular open port which was nearest to Arica, in order to discharge the Arica cargo, and be still bound to go again to Callao, or near there, to discharge the rest. None of the parties proposed any such course. Their subsequent action was, in fact, wholly outside of the charter, and had apparently no reference to that clause of it.

As respects Callao as a "second port," there is no provision in the charter providing for any substituted port should the "second port"

named be found to have been blockaded before her arrival there. If the shipper had still an unrestricted right to name any other open port of Peru as a "second port" (*The Teutonia*, L. R. 4 P. C. 171, 182) in consequence of the blockade of Callao before arrival there, still this right was limited by the express exclusion under the charter of any port "north of Callao." No port south of Callao was at that time proposed by either party; and it does not appear in evidence whether any port to the south, and within reasonable distance of Callao, was at that time open or not. The stipulations of the charter as respects the place of delivery were evidently abandoned. Upon the arrival of the ship off Callao, therefore, the dealings of the parties had been such as to exhaust the express provisions of the charter. The situation then became, in effect, the same as if Callao had been the only port of discharge named in the charter-party, with no reference to the contingency of blockade. *The Teutonia*, L. R. 4 P. C. 171, 182; 4 Adm. & Ecc. 394. This results necessarily from the fact that both had waived the "next open port" clause of the charter, and neither party afterwards acted on it or proposed to act upon it.

3. In case of a blockade of the port of destination, especially where, as in this case, the very place of discharge is subject to the major force of the blockading squadron, and in the absence of any alternative provisions in the charter, the English and American authorities apparently sustain the respondents' contention that the obligations of the charter-party, as a strict common-law contract, are dissolved. The blockade operates on both parties alike. It is a major force that prevents each from performing his own part of the contract. If it disables the ship from delivering the cargo as agreed, it equally disables the consignee from receiving it as agreed. The obligations on the one side to deliver the cargo, and on the other side to receive it, are concurrent obligations; and neither party being able to perform his own part of the contract through a major force and without any fault of his own, neither can maintain any action against the other for the non-performance of it. *Cunningham* v. *Dunn*, 3 C. P. Div. 443; *Ford* v. *Cotesworth*, L. R. 4 Q. B. 127; L. R. 5 Q. B. 544. If this major force were temporary only, the effect would be only a suspension of the obligations of the contract till this superior force were withdrawn; as in the case of an *embargo* of the port of departure, where the vessel, as it is held, may retain the cargo, unless perishable, till the embargo is removed, and then complete her voyage and earn the stipulated freight. But by the English and American law a *blockade* of the port of destination is regarded as a permanent obstacle to the completion of the contract on either side. *Hadley* v. *Clarke*, 8 Term R. 259; *Palmer* v. *Lorillard*, 16 Johns. 348; *Geipel* v. *Smith*, L. R. 7 Q. B. 404, 414. This distinction between the effects of an embargo and of a blockade is well settled in the English and American law, though not in accord with the provisions of the majority of the continental codes on the same subject. The effect of such a blockade under our

law is therefore to relieve each party from the obligation to deliver the cargo or to receive it at the specific place designated in the charter, without any liability for damages by either to the other; and this, in substance and effect, is a dissolution of the specific contract as a common-law obligation.

Such was the direct adjudication in the case of *Scott* v. *Libby*, 2 Johns. 336, 3 Kent, \*223, where the vessel, finding her port of destination blockaded, brought the cargo back to the port of departure. The obligations of the contract were deemed dissolved, and it was held that no freight was recoverable, although by the continental law the freight one way would have been allowed. English text writers have repeatedly declared this to be sound law, on the ground that a contract which cannot be performed without running a blockade, and thus violating the law of nations, cannot be binding. The same opinion is expressed in the recent work of Valroger, (4 Comm. du Code de Com. p. 27, § 1560;) Abb. Shipp. \*601; Marsh. Ins. 57; and Sir Wm. Scott, in the case of *The Tutela*, 6 C. Rob. 177, *infra*, so assumed. But no such ground was stated in the opinion of the court in *Scott* v. *Libby*. A breach of blockade has no other effect by the law of nations than to subject vessel and cargo to condemnation as prize. It has been viewed, therefore, as a case, not of a strictly illegal act, in the ordinary sense of illegality, but as a case of conflicting rights; and if this is sound, it is not clear that the courts of a third power could logically refuse damages for a breach of a deliberate contract between its own citizens to run a blockade, where neither its own municipal law nor its treaty stipulations forbade it; though in the latter cases damages would be recoverable. *De Wutz* v. *Hendricks*, 2 Bing. 314; *Kennett* v. *Chambers*, 14 How. 38. An insurance of contraband goods by a neutral is, on the grounds above stated, held valid, (3 Kent, \*267; 1 Arn. Ins. 706; 2 Valen, 127; 1 Emerig. 215; *Richardson* v. *Marine, etc.*, 6 Mass. 102; *Seton* v. *Low*, 1 Johns. Cas. 1; *Barker* v. *Blakes*, 9 East, 292; Letters of Historicus, 138;) and I see no good reason why an express contract to carry such goods should not be as valid as a contract to insure them. Such seems to be the effect of the judgment of Lord Westbury, in the case of *Ex parte Chavasse*, 34 Law J. Bankr. 17, 18. See article by J. N. Pomeroy, N. A. Rev. April, 1870, p. 381. On the other hand, if the principles of the Geneva award should be so extended as to require a neutral nation to pay damages for all infractions of the obligations of strict neutrality through the acts of its subjects,—a liability not yet recognized, and strenuously opposed by some authors, (see Mr. Pomeroy's article, *supra*,)—it would be a singular anomaly if the courts should uphold and enforce contracts which, if performed, might require their own government to pay damages. Maclachan, (page 578,) not without reason, regards "the English law on this subject as not settled in all its relations." But upon a voyage not designed to run a blockade a master has no right to expose ship and cargo to seizure

and confiscation, by attempting to break it, if the blockade be apparently effective.

This case, however, is not that of a contract, express or implied, to run a blockade, and to reach some interior landing-place where the consignee is ready to receive the cargo. It is the case of a disability by each to deliver or to receive the cargo, by reason of a blockade of the very spot of delivery. In the case of *The Tutela*, 6 C. Rob. 177, the blockade was regarded as making the prior contract illegal. Sir WILLIAM SCOTT, in delivering the judgment of the court, says:

"He [the captain] seems to have entertained no doubt upon that point, but to have acted only under *an* opinion that because he had signed the charter-party he was bound to proceed; * * * as in all other contracts that *become illegal*, he might have protested against being any longer bound by his charter-party."

In *Geipel* v. *Smith*, L. R. 7 Q. B. 404, 412, it was decided that if the port of destination be blockaded after the execution of the charter-party, the charterer may refuse to load. This decision was, however, in part based on the exception of "restraint of princes" which the charter contained. But the court sustained the fifth plea also, which made no reference to that exception, on the ground that *the major force put an end to the adventure*. Pages 405, 410, 411. To have this effect, however, the blockade must be real and effective. In *Medeiros* v. *Hill*, 8 Bing. 231, the owners were held liable in damages for not sailing to the blockaded port according to the charter, the blockade at that time having ceased to be real or effective, and hence no real obstacle to the ship's performing her agreement. And, conversely, in the case of *The Harriman*, 9 Wall. 161, the owners were held in default and entitled to no freight, because they did not attempt to complete the voyage as agreed on, but returned when 1,200 miles distant from the destination of the ship.

It is doubtless a well-settled rule of law that parties must abide the risks of their express contracts, and answer in damages for defaults which they have not guarded against by appropriate exceptions. *Holyoke* v. *Depew*, 2 Ben. 340; *Paradine* v. *Jane*, Aleyn, 26. But this rule, in its practical application, is subject to another rule, equally well settled, viz.: that if the obligations of the parties be concurrent and dependent, and neither is ready or able to perform his own part, neither has any remedy in damages against the other. In applying these rules to a case of blockade, there is, perhaps, a distinction between those cases where the blockade is at a distance from the place where the delivery is to be made, and merely prevents access thereto, and other cases in which the blockade operates directly upon the place of delivery itself. In the former cases the consignee may be able and ready to receive the cargo if the ship could reach her berth; and in that case the disability is upon the ship alone. In the latter, the major force, as in the present case, operates upon both parties alike, and prevents the consignee from receiving the cargo, as

much as the ship from delivering it. In this case the ship did all that was required of her in proceeding to the various ports specified. The cargo could only be received at Arica or at Callao, in lighters. In consequence of the blockade, the ship could not get in "readiness to discharge" the cargo, within the terms of the charter, at either Arica or Callao, and the consignees were equally disabled from receiving it; and, after reaching Callao, the charter contained no further appropriate provisions.

4. Under the codes of most commercial nations, the obligations of the ship, in such circumstances, are more or less defined by positive law,—not, however, by any statutes of England or of the United States. Sir JAMES MANSFIELD, in the case of *Christy* v. *Row*, 1 Taunt. 300, remarks as follows:

"Where a ship is chartered upon one voyage outwards only, with no reference to her return, and no contemplation of a disappointment happening, no decision which I have been able to find determines what shall be done in case the voyage is defeated. The books throw no light on the subject. The natural justice of the matter seems obvious: that a master should do that which a wise and prudent man would think most conducive to the benefit of all concerned. But it appears to be wholly voluntary; I do not know that he is bound to do it; and yet, if it were a cargo of cloth, or other valuable merchandise, it would be a great hardship that he might be at liberty to cast it overboard. It is singular that such a question should at this day remain undecided."

During the Napoleonic wars American vessels bound to European ports not unfrequently found themselves in that situation. In the case of *The Friends*, Edw. 246, Sir WILLIAM SCOTT says:

"In the case of the American ships bound to France or Holland which were brought into the ports of this country under the prohibitory law, the full freight was pronounced to be due where the owners of the cargoes elected to sell here; where they did not elect to sell here the court left it to them to settle the freight with the owners of the ships. The court considered a voyage from America to this country very nearly the same, in effect, as a voyage to those contiguous countries to which those vessels were originally destined; in all probability the markets of this country were not less favorable than in the blockaded ports, and no doubt the sale was effected with every attention to the interests of the owners of the cargo. In those cases the court gave the master the full benefit of the freight, *not by virtue of his contract, because, looking at the charter-party in the same point of view as the courts of common law, it could not say that the delivery at a port in England was a specific performance of its terms; but there being no contract which applied to the existing state of facts, the court found itself under an obligation to discover what was the relative equity between the parties.* This court sits no more than the courts of common law do to make contracts between parties; but as a court exercising an equitable jurisdiction, it considers itself bound to provide, as well as it can, for that relation of interests which has unexpectedly taken place under a state of facts out of the contemplation of the contracting parties in the course of the transaction."

The provisions of the various commercial codes on this subject are not uniform. The French Code de Commerce, art. 279, provides that, "in case of the blockade of the port of destination, the captain, if he

has no contrary orders, shall go to some neighboring port of the same country where he can unload." Article 277 provides that "if a major force exists that prevents only temporarily the departure of the ship, the contract remains, without any claim to damages for the delay; the agreement equally remains, without increase of freight, if the major force happen during the voyage." By article 276: "If an interdiction of commerce arise before the ship depart, the charter is dissolved without damage claims by either." 2 Valroger, Lois Mar. §§ 716–726. Sections 499 and 505 of the Code of the Netherlands are to the same effect. Accordingly, during the war of the rebellion, a ship, finding New Orleans blockaded, was held justified in coming to New York to unload. Havre, twenty-eighth January, 1862, L. 28. If all the ports of the same country are closed, Pardessus was of opinion that the captain must return to the port of departure. 6 Ed. II. § 641. Nevertheless, it was decided at Rouen, (February 27, 1847, 48 Dall. 2, 150,) that a captain might go to the port of a neighboring country if he judged it for the general interest; and he was held justified in landing his cargo at Montevideo upon finding Buenos Ayres, his destined port, closed. In such cases, by the French law, the full freight is earned. But if the captain be compelled to return without unloading, he is entitled to his outward freight only. Article 299. The same is the provision of the Commercial Code of the Netherlands. Section 504.

The German Code, on the other hand, provides (section 631) that either of the parties may rescind the contract without being held for damages, if, among other things, "the port of discharge or destination is blockaded." Article 636 provides for an apportionment of freight *pro rata*.

The Spanish Code, art. 780, provides that "when, in consequence of a blockade or other cause, the ship cannot reach her port of destination, the captain shall proceed to the next nearest port, and if no one is there to receive the discharge, he shall await the orders of the charterer or consignee; the expenses of delay being *a common average;* and the inward freight to be paid entire."

The Peruvian Code, § 785, is nearly identical.

The captain in this case seems to have acted with some reference to the provisions of the Peruvian Code. But even if that law were applicable as the law of the place where the contract was to be performed, that law would only operate according to its own terms; and it is not clear that the provision, that the "expenses of delay shall be a common average," does not include the delays unavoidably arising in the "next port," as much as the delays in getting there; that is, when such "next port" resorted to is not a port embraced in the express contract, but one, like Ancon and Chancay, wholly outside the provisions of the charter.

The Italian Code of 1882 provides (section 553) that "in case of a blockade of the port of destination, or of other accident, or major

force, which prevents the entrance of the ship to her port, the captain, if he has not received orders, or if the orders received cannot be executed, must act for the best interests of the shipper, either in unloading in some neighboring port, or in returning to the port of departure." By section 572, if the ship be obliged to return without unloading, she will be entitled to her outward freight only, though chartered for an outward and return voyage.

Article 92 of the Belgian law of August 21, 1879, is to the same effect. For the provisions of numerous other codes on the same subject see 3 Desjardins, Droit Com. Mar. §§ 789–792, 808, 809.

The general questions here involved were recently discussed in the privy council in the case of *A Cargo ex Argos*, L. R. 5 P. C. 134, 161, 167. In that case the Argos, carrying petroleum from London to Havre, on arrival at Havre, was not allowed to land the petroleum, because prohibited by the local regulations; and the ship proceeded to the ports of Honfleur and Trouville, hoping to be able to unlade the petroleum there, but without success. She then returned to Havre, and obtained permission to deliver the petroleum on board a vessel or lighter, to remain for a few days within the port; but not to land it. The consignee refused to accept it except upon the wharf where goods were usually landed; the vessel was afterwards required by the authorities to reship the petroleum, which she thereupon brought back to London. Upon a libel filed against the petroleum for outward and return freight, demurrage, and expenses, the ship was allowed her freight, on the ground that she had been able to make a sufficient delivery of the petroleum within the port of destination, upon lighters at Havre, and that the defendant was bound to receive it upon lighters there; but that the ship was *not entitled to any demurrage or expenses* for her detention in previously going to and from Honfleur and Trouville in the endeavor to effect a delivery, or otherwise, up to the time she received permission to make a delivery upon lighters at Havre, and offered to do so. The general authority of the master, under the maritime law, to act for the best interests of the ship and cargo in unforeseen emergencies, was held to be applicable to the case. Referring to some of the authorities on this subject the court say, (page 165:)

"It results that not merely is a power given, but a duty is cast, on the master, in many cases of accident and emergency, to act for the safety of the cargo in such manner as may be best under the circumstances in which it may be placed, and that, as a correlative right, he is entitled to charge its owner with the expenses properly incurred in so doing. Most of the decisions have related to cases where the accident happened before the completion of the voyage; but their lordships think it ought not to be laid down that all obligation on the part of the master to act for the merchant ceases after a reasonable time for the latter to take delivery of the cargo has expired. It is well established that if the ship has waited a reasonable time to deliver goods from her side, the master may land and warehouse them at the charge of the merchant; and it cannot be doubted that it would be his duty to do so rather than to throw them overboard. In a case like the present, where the goods could neither be landed

nor remain where they were, it seems to be a legitimate extension of the implied agency of the master to hold that, in the absence of all advices, he had authority to carry or send them on to such other place as, in his judgment, prudently exercised, appeared to be most convenient for their owner; and if so, it will follow from established principles that the expenses properly incurred may be charged to him. Their lordships have no doubt that bringing the goods back to England was, in fact, the best and cheapest way of making them available to the defendant, and that they were brought back at less charge in the Argos than if they had been sent in another ship. If the goods had been of a nature which ought to have led the master to know that on their arrival they would not have been worth the expense incurred in bringing them back, a different question would arise. But, in the present case, their value, of which the defendant has taken the benefit by asking for and obtaining the goods, far exceeded the cost. The authority of the master, being founded on necessity, would not have arisen if he could have obtained instructions from the defendant or his assignee."

These views, it will be observed, are in general accord with the duties laid down by the recent Belgian law, and by section 553 of the recent Italian Code, above cited. Like the provisions of those Codes, they are equally applicable to a state of blockade, and may be regarded as best indicating the obligations of a master on finding his destined port blockaded, in the absence of specific statute regulations.

It must be borne in mind that in the common-law courts the contract of affreightment is required to be completely performed in order to entitle the ship to freight. In case of a failure to deliver the cargo as agreed, whether through blockade or other major force, unless there be some such voluntary acceptance by the consignee as imports a new contract to pay either the whole freight or an equitable proportion of it, not even a *pro rata* freight can be recovered by the ship at law or in equity. *Smith* v. *Wilson*, Abb. Shipp. *453; *Osgood* v. *Groning*, 2 Camp. 466; *Hopper* v. *Burness*, 1 C. P. Div. 137; *Metcalfe* v. *Britannia Iron-works Co.*, 2 Q. B. Div. 423; *Vlierboom* v. *Chapman*, 13 Mees. & W. 238; *Castel* v. *Trechman*, 1 Cababe & Ellis, 276, (1884;) Macl. Shipp. 475, 478, 482, 488.

By the maritime law, however, from the earliest times, it has been held that if the ship, through accident or major force, is prevented from completing her voyage, the owner, on receiving his goods, must pay ratable freight. Roccus, 81; Consolato, *c.* 151; Oleron, art. 4; Wisbey, art. 16; Jac. Sea Laws, 267; 1 Pars. Shipp. & Adm. 239, note; Macl. Shipp. 478; *Palmer* v. *Lorillard*, 16 Johns. 364. The allowance of *pro rata* freight in these cases proceeds, says Maclachlan, "not upon contract, but upon meritorious services on the part of the ship;" and the same view is more fully expressed by Sir WILLIAM SCOTT in the case of *The Friends*, above cited. So, in the case of *Scott* v. *Libby*, *supra*, THOMPSON, J., says:

"A variety of cases may occur where the owner of goods may make himself responsible for freight by an acceptance of his goods short of the port of destination. But this results [in the common-law view] from an implied con-

tract raised by the acceptance of the cargo, and a supposed benefit received by the owner from a partial transportation of his goods."

Chancellor KENT, shortly afterwards, in the case of *Palmer* v. *Lorillard*, 16 Johns. 348, which arose out of an embargo, says, (page 355:)

"Any delivery short of the port of destination must have been a matter of consent and agreement, and not of strict obligation."

And at page 357 he continues:

"There is no doubt that if a voyage be broken up after its commencement, by war or interdiction of commerce with the place of destination, the contract is dissolved, and the freight gone." 3 Kent, *223.

From what has been said it would seem that by our law a blockade that prevents both parties from performing their concurrent obligations as to the receipt and delivery of the cargo dissolves the specific contract; that by the common-law, unless there be some further express contract, or an implied one, through acceptance of the cargo elsewhere on account of the contract, or some beneficial service, no freight is earned; that upon such an interruption of the voyage, it is the maritime duty of the master to obtain the instructions of the shipper, if practicable; if that is not practicable, that the master has authority, by the maritime law, to act for the best interests of those concerned, either in landing the goods elsewhere, or in bringing them back to the port of departure; and that he will receive freight, or no freight, according to the extent of the beneficial services rendered; and that neither side has any claim for damages for the delay, or the defeat of the voyage, under the original contract.

Where the original agreement cannot be strictly performed by a delivery at the place stipulated, or where it has been waived, and a delivery of the cargo is made elsewhere under some further agreement, or by instructions from the shipper, it will be a question of construction, in the absence of express stipulation, whether the new place of delivery is to be deemed a mere substitute for the former, with all the subordinate terms of the charter applicable as before, or whether the minor incidents of the charter are to be deemed superseded. This question must be determined according to the presumed intention of the parties, to be gathered from all the circumstances. If the change were a mere voluntary substitution of one place of delivery for another, and there were no essential difference in the circumstances of the two places, such as would make the original provisions inequitable or unreasonable, the subordinate provisions of the original agreement would be deemed continued, because no reason would exist for supposing any change in them intended. *Jackson* v. *Galloway*, 5 Bing. N. C. 71, 76; S. C. 3 Man. & G. 960; Macl. Shipp. 530. But where, as in this case, the change is not made from choice, or for the mere convenience or interest of the parties, but is compulsory on both, and made under the stress of circumstances, in order to prevent the entire defeat of the voyage, and where the substituted place

of delivery is so dissimilar to the former in all its conditions that it would be unreasonable to apply the previous incidental stipulations, as respects demurrage or the rate of discharge, such stipulations cannot be deemed preserved by mere implication. Adopted in the charter as respects the original place of discharge, because presumptively adapted to it, they would be deemed abandoned in the new contract, made under the compulsory selection of a totally different place of discharge, because unadapted or inapplicable to the latter. Under such circumstances of necessity, the obligations of each are to use reasonable diligence in the delivery and receipt of the cargo, whatever be the particular stipulations of the original charter. *Ford* v. *Colesworth*, L. R. 4 Q. B. 127.

5. Upon finding Callao blockaded, the express provisions of the charter, as to place of delivery, being exhausted, the master, as was his duty, had applied to Grace & Co. on April 10th for instructions. They were unable to give any at once, but on the following day replied: "We are prepared to receive your cargo at Ancon, to where you will proceed with all possible dispatch." On the 12th they sent an agent there to receipt for the cargo. On the 14th they promised to send two launches, but add: "There may be some delay in commencing the discharge; when we do begin we hope to make short work of it." The Spartan went to Ancon, and came finally to anchor, prepared to discharge her cargo, on April 13th, about half a mile from the shore. It does not appear whether any better port was then available. No other or better was proposed by the captain, and there is no charge of any lack of proper judgment or discretion in Grace & Co. in selecting Ancon. No fault can therefore be assumed in sending the Spartan to Ancon. Grace & Co., on choosing Ancon, had at once contracted for the exclusive use, so far as possible, of the mole, the three launches, and the small warehouse that were at Ancon, and which constituted the only facilities for discharging that existed there. They also sent at once from Callao four launches, and chains, anchors, kedges, and tackle to establish suitable moorings for landing upon the beach such parts of the cargo as, not being dutiable, could be so landed. The discharge was not actually begun till the twentieth of April, and by the eighteenth of May, when Ancon was blockaded, only 23 lighter loads, or about half the cargo, had been discharged.

The evidence presents no little difficulty in determining whether all reasonable diligence was used by the charterers' agents after the arrival at Ancon. Grace & Co. were not bound to employ every lighter they could obtain in the service of the Spartan alone. They were the agents of other vessels also; and they had vessels of their own arriving at about the same time as the Spartan, or a little later. They owed no greater duty to the Spartan than to others. The time during which the Spartan lay at Ancon, namely, from April 13th till May 18th, would have been more than sufficient to unload according to the

"customary dispatch" of Callao or Arica, viz., two lighter loads per day. At this rate, 20 actual working days would have sufficed. The discharge at Ancon was not begun till the twentieth of April, six days after the Spartan was in readiness to discharge. The master testifies in general terms that there were abundant means to complete the discharge of the Spartan before the eighteenth of May, when she was obliged to leave Ancon. But the acount of the matter given by Grace & Co., and their representatives, goes far towards exonerationg them from blame, and towards showing that all reasonable efforts were used for dispatch in the Spartan's discharge.

Ancon was not previously a port of entry, but only made so upon the blockade of Callao. No similar cargoes had been previously discharged there. Its only facilities for discharge were an old narrow mole, with a railroad track upon it leading to a warehouse, the property of the railroad company, some 300 yards back from the beach, and three old launches. Many sail-vessels came into Ancon after Callao was blockaded. The vessels of the Pacific Steam Navigation Company also came in frequently, and always, when there, had the preference in the use of the mole and of the three launches. All dutiable goods had to go by way of the mole to the warehouse, used as a custom-house; and after an additional lighter was provided by Grace & Co. the discharge of such goods was liable to constant interruptions by the preference given to the steamers in the use of the mole. Of the four lighters dispatched from Callao, two were shipwrecked, one captured, and the fourth arrived on the evening of April 20th. There were also surf days when no cargo could be landed either upon the beach or at the mole. Three gangs of laborers, of 15 men each, were sent by Grace & Co. to Ancon, none being procurable there; two of their own employes were there all the time as superintendents; and, after the removal of the firm's office to Lima in consequence of the expected bombardment of Callao, one of the members of the firm came to Ancon, and gave all his efforts to the speedy discharge of the Spartan, and of the other vessels in their charge. The general testimony of many of the persons thus employed is that all was done that could be done towards the speedy unloading of the Spartan; and that no other vessel out of a dozen sailing vessels there at the same time was discharged with equal rapidity, save perhaps their own vessel, the Lillie Grace.

This testimony is mainly in general terms. It was taken by depositions, and nearly four years after the transactions. No record is preserved of any of the details of the daily difficulties, or of the daily work accomplished. On the part of the ship the testimony is equally general; save that the log states the days on which lighter loads were discharged, and the number. But that presents no record or recognition of any of the difficulties encountered, or of the causes of interruption.

From testimony of this character it is evidently impossible to arrive at any very exact or satisfactory conclusion. Two ordinary lighter loads per day would constitute "customary dispatch." If that rate could have been continued every working day the Spartan would have been fully discharged at Ancon between April 20th and May 18th. But the sharp contention for the possession of lighters to use in discharging is proved by one passage in the captain's testimony, where he says that he *but once* committed the *criminal offense* of cutting away from the steamer a lighter which he thought belonged of right to the use of the Spartan. After May 11th, when eight days'. notice was given to neutrals to withdraw, the discharge was more rapid than before. During the six following working days 10 lighter loads were discharged; during the 19 previous working days, going back to May 20th, only 13 lighter loads were discharged. On eight of these 19 days there was no discharge; on only two days were two loads per day taken; on the rest one load only each day. No explanation of the much greater expedition after May 11th is given. The pressure on the part of other vessels would naturally have been at least as great as before, and the embarrassments as numerous; for all were, of course, anxious to discharge; and none, as it appears, were fully discharged at the expiration of the notice of blockade. From the entries in the log of the Spartan it would appear that there were but two days when there was much swell; on one of them one lighter load was discharged. The captain calls the other a surf day. All the other days are described as fine. The respondents say there were several surf days, but the number is not stated. Omitting two surf days and the holidays, the same rate of discharge before the 11th as after would have given a discharge of 38 loads at Ancon, instead of 23, during the 22 working days between April 20th and May 18th.

That Grace & Co., between the eleventh of May and the eighteenth, did all that could be done for quick dispatch may be inferred from the circumstance that on the 16th, which was Sunday, when the captain gave all his crew liberty to go ashore, Grace & Co. sent a full complement of men to the Spartan, and discharged two loads of merchandise. The log states the discharge of about 46 full lighter loads in all. Thirty-eight loads would have been five-sixths of the cargo. Before the twentieth of April there were five fair working days after the Spartan got ready to discharge on the 13th; but, considering that there were but three old launches altogether at Ancon before the 20th, with three vessels, besides the steamers, contending for them, and that one of the three launches was, in fact, sent to the Spartan, I do not think there is sufficient to warrant the inference of any neglect of ordinary diligence by Grace & Co. before the twentieth of May. They had done all they could by contracting for the use of the facilities there; they alone had the use of the mole; they were necessarily busily em-

ployed in the removal of their office from Callao to Lima, in conse-
quence of the blockade and threatened bombardment; and they sent
clerks and launches from Callao with all necessary appliances for dis-
charging on the beach without delay. The launch which came from
Callao arrived on the 20th, while the other launch was loading. After
one of the firm was able to come to Ancon in person, the discharge was
more rapid, probably from his being able to enforce their interests
more energetically. After the twentieth of April, when the lighter
sent from Callao arrived, I do not think the explanation given in gen-
eral terms by the respondents accounts satisfactorily for the whole of
the delay up to the eleventh of May. The lumber was accessible at
all times; it could be landed on the beach; it was much in the way
on board ship. Yet no lumber, as the log would intimate, was dis-
charged until May 12th. On that day, and the three following days,
six loads of lumber were discharged, and considerably more remained,
which embarrassed the ship at Chancay. No reason appears why
lumber should not have been landed on the beach by the lighter owned
by Grace & Co., and sent for the Spartan's use, on the seven days fol-
lowing, viz., April 23d, 26th, 28th, 30th, and May 3d, 4th, and 8th.
I therefore hold them accountable for the loss of these days. On the
remaining eight days, besides surf days, on which, with one day's ex-
ception, but one lighter load was discharged, I think the difficulties
and embarrassments proved to exist must be accepted as sufficient
to exempt them from the charge of want of ordinary diligence.

I am satisfied that these difficulties were sufficient to excuse Grace
& Co. from having the Spartan's discharge completed at Ancon. As
stated above, the highest rate of discharge, viz., that after May 12th,
would have reached but 38 lighter loads, if the same rate had been
kept up from April 20th, while the cargo amounted to at least 46
loads. And it is reasonable to suppose that the rate of discharge
after May 12th, under the eight days' notice of blockade, was not
merely that of reasonable diligence, but that of the greatest pressure
they could apply to the work; of which the work on Sunday, the 16th,
and their furnishing the ship with men, which Grace & Co. were not
bound to do, is significant evidence. Moreover, the language of the
captain in his first formal protest as to the delay, viz., that of June
15th, indicates the same result; for, although he therein claims that
the cargo might all have been discharged at Ancon, yet, in specifying
what time was sufficient, he says: "The Spartan could have dis-
charged her entire cargo in 30 working days." From the thirteenth
of April, when the Spartan reached her anchorage, to the seventeenth
of May, after which she was obliged to get ready to leave, there were
but 34 days; or, deducting Sundays and two surf days, 27 working
days all told; and from these should certainly be deducted two or
three of the first few days after the Spartan's arrival at Ancon, ow-
ing to want of facilities there. The captain's estimate of 30 working

days is evidently not based on the "customary dispatch" of the coast; for that would not have required more than 20 working days at most. It has reference, therefore, to such impediments as he had observed to exist at Ancon.  I cannot hold the respondents accountable, therefore, for all the subsequent delay after leaving Ancon, on the ground that the discharge should have been completed there; but charge them for seven days' demurrage at that place.

When obliged to leave Ancon, the captain determined to go to Chancay, the next port to the north, upon his own choice.  Grace & Co. afterwards acquiesced.  It was not ordinarily a safe place for landing cargo on the beach, it was never before a port of entry, and there were even less facilities than at Ancon.  There was an old mole, owned by an estate, used for shipping sugar-cane.  What facilities there were had been previously engaged by one Quesada, whom Grace & Co., not at first, but subsequently, employed to discharge the Spartan.  The Lillie Grace went there to complete her discharge, and towed with her a launch for the purpose.  The captain of the Spartan refused to tow a launch for the use of his own vessel, as requested by Grace & Co., and as he might have done, and thus have saved the delay that at first occurred there.  The request was a reasonable one; the refusal was unreasonable, and not in fulfillment of his maritime obligation to do what he could for the common interest.  There was no risk in the towage, for Grace & Co. proposed that the towage should be done at their own risk.  The Spartan was ready to discharge at Chancay on the twenty-first of May. Four working days were lost before any agreement with Quesada was arrived at for discharging the Spartan.  Under the circumstances the loss of these days should be charged to the Spartan's refusal to tow a lighter along with her.  The log shows many days with a heavy swell that would make landing dangerous.  One launch was beached and rendered unserviceable, and the cargo damaged.  There were but two other fair days up to the eleventh of June, when the discharge was not going on, and which I regard as unexplained.  On the eleventh of June a difficulty arose because the agent of Grace & Co. declined to take the lumber, but wanted other cargo, which the Spartan refused to deliver on account of want of enough ballast to keep the vessel from being top heavy.  It is unnecessary to specify in detail the difficulties which prevented the transshipment of the lumber at Chancay to other vessels, which Grace & Co. endeavored to accomplish.  I charge Grace & Co. with the two days' delay at Chancay, above referred to, and with two other fair days after the difficulty about ballast. Grace & Co. were not responsible for the lack of ballast.  They did what they could to enable the vessel to get it.

On the last day at Chancay, after the notice to leave, the Spartan took aboard more lumber from a German bark for Iquiqui, "our next port," as stated in the log.  This port was not agreeable to the wishes

of Grace & Co., who, having obtained the consent of all the remaining cargo owners to receive their goods at Salaverry, two days' sail further north, desired the Spartan to proceed' thither, and offered the captain £100 additional compensation to do so. The offer was a liberal one. No sufficient reason is shown for declining it. The captain, however, refused it, and proceeded southward, stopping at San Lorenzo and Huacho, where he met with long detentions, for which the respondents are not answerable; and he afterwards went to Arica, where, in August, the blockade had been raised. Considering the refusal to go to Salaverry, and the proof of military interference and confusion that still prevailed at Arica, no allowance can be made for the short delays in the final discharge at Arica, and I find on the whole, therefore, that Grace & Co. are chargeable with but nine days' delay, making $658.80, for which, with interest from August 25, 1880, and costs, the libelants are entitled to a decree.