THE STYRIA (four cases).

(District Court, S. D. New York. April 5, 1899.)

1. SHIPPING—DISCHARGE OF CONTRABAND CARGO.
   Although provisions in a bill of lading permit the discharge of cargo at other ports than that to which it is consigned in case of circumstances of war, which, in the opinion of the master, render it unsafe to enter or discharge there, the master, as agent of all concerned, is bound to exercise prudence to protect the interests of the cargo as well as the vessel, and the discharge of cargo by him at another port, as being contraband of war, is not justified unless the facts show that there was reasonable necessity therefor.

2. SAME—FACTS CONSIDERED.
   The Austrian steamship Styria was loaded at an Italian port with a cargo of sulphur consigned to New York, and cleared on April 24, 1898. On the day before, a Spanish proclamation was issued, declaring the existence of a state of war between Spain and the United States, and in which sulphur was declared contraband. On April 27th, the master, who had not sailed, commenced the discharge of the cargo, which was completed May 7th. Almost immediately after the declaration of war the public prints contained statements of negotiations for the purpose of having sulphur exempted from contraband goods, and repeatedly stated that such efforts would be successful, of which statements the master was aware, and also of the announcement of their success, and he was also notified of such result by one of the shippers before the discharge of the cargo was completed. At the next Italian port, to which he went for a new cargo on May 10th, he heard read an official announcement to the same effect, though it had not been publicly proclaimed. Other vessels sailed at about the same time he cleared with cargoes of sulphur, and were not molested. *Held* that, under the circumstances, it was his duty to wait a reasonable time before discharging the cargo, and, as he had reasonable assurance of safety by May 10th, he was not justified in such discharge.

3. SAME—TRANSSHIPMENT OF CARGO.
   If the vessel in such case was justified in discharging the cargo under a clause of the bill of lading permitting her to transship in case of emergency, rather than to subject herself to a delay of unknown duration, such clause being for the benefit of the vessel alone, on its being ascertained that she might have proceeded within a reasonable time, the cost of the discharge, storage, and reloading must be borne by her.

4. SAME—CONSTRUCTION OF BILL OF LADING—MEASURE OF DAMAGES FOR INJURY TO CARGO.
   A stipulation in a bill of lading limiting the liability of the vessel to the invoice or declared value of the goods does not authorize the carrier to deduct the freight from such value in case of loss or damage.

These were libels by James L. Morgan and others and three other libelants against the Austrian steamship Styria.

Cowen, Wing, Putnam & Burlingham, Sullivan & Cromwell, Bowers & Sands, and Stern & Rushmore, for four different libelants.

Convers & Kirlin, for defendant.

BROWN, District Judge. The above four libels were filed to recover the damages claimed to have been sustained by the libelants, who were the consignees of different lots of brimstone shipped upon the Austrian steamship Styria at Port Empedocle, Girgenti, Sicily, in the latter part of April, 1898, and shortly afterwards discharged at the same port, as contraband goods, on the breaking out of the war

with Spain. The loading was finished on April 24th, and the bills of lading were signed and the ship cleared from the custom house at Port Empedocle on the same day. On April 20th the Spanish minister left Washington, and on April 21st our minister left Madrid. On April 23d the queen regent of Spain issued a decree announcing the existence of war with the United States, which was published in the official papers at Madrid on April 24th, and communicated to the other powers and made public on or about April 25th. On that day it was published in the newspapers of this country, and presumably in Sicily and England. The declaration of war was made by the United States under an act passed April 25th, declaring the existence of war since April 21st. On the 22d the president had proclaimed a blockade of certain Cuban ports.

In article 6 of the Spanish proclamation, sulphur was declared contraband of war.

On April 23d the master received a telegram from Burrill & Sons, the managing agents of the owners of the Styria in London, not to sail until further instructions, and on the 25th, a telegram "to discharge whole cargo as quickly as possible." On the 26th, the weather being bad no work was done. On the 27th the discharge was commenced and continued until May 7th, when it was completed. The ship then cleared and proceeded to Messina and Palermo, from which ports she sailed with a cargo of fruit on May 9th, and arrived at New York on June 3d. At the commencement of the discharge of the sulphur at Port Empedocle the master gave a notice to the shippers, and to the Austrian consul at Girgenti, stating that "on finding risky his passage to New York with a sulphur cargo, for facts of war" he discharged the cargo on their account and risk under the bills of lading. He testifies that though directed to discharge by the owners, he did not deem it safe to proceed with a contraband cargo, and would not have sailed with such a cargo without knowing certainly that sulphur was free; that he knew sulphur to be contraband of war; that Spain held it to be so; that war existed; that he heard that a blockade of New York was going on; that his course lay along the Spanish coast; that Spanish men of war were looking for ships there; that he believed this report; that the newspapers in Sicily reported the capture of a sulphur ship; that up to the time he left Sicily there was no public or official declaration that sulphur had been excluded by Spain from the list of contraband goods.

On the other hand it appears from the captain's testimony and other evidence, that almost immediately after the proclamation was published, negotiations were entered upon for the exception of sulphur from contraband goods; that the captain was aware from the public prints of these negotiations, and of the frequent statements in the public prints that the efforts for the exception of sulphur would be successful, and of the announcement before he left Sicily that sulphur would go free. There was not, however, any official confirmation of this statement, though the papers published it as a fact. On April 25th and 26th the Lord Warwick, which lay alongside of the Styria, sailed for New York with brimstone, and two other vessels from Licata with a similar cargo; all of which passed safely. One of the

shippers by the Styria, Baller & Co., on May 5th gave notice to the master that "sulphur is no longer contraband of war," though saying in their protest "it is not yet officially confirmed." At Messina, the captain heard read an official announcement by the prefect that the following telegram had been received by him on May 4th from the minister of the interior:

"The Spanish government has declared officially in a circular to the commanders of its own ships, that it has decided that sulphur should not be considered as contraband of war. There is no public or official declaration, but there can be no doubt that sulphur will pass freely."

It does not appear that any vessel was stopped by the Spanish on account of sulphur.

Among the exceptions in the bills of lading, were the following:

(a) "Restraints of princes and rulers or people excepted."
(b) "In case of blockade or interdict of the port of discharge, or if without such blockade or interdict, the master shall consider it unsafe, for any reason, to enter or discharge cargo there, he is to have option of landing the goods at any other port which he may consider safe, at shipper's risk and expense; and on the goods being placed in charge of any mercantile agent or of British consul, and a letter being put into the post office, addressed to the shipper and consignee, if named, stating the landing and with whom deposited, the goods to be at the shipper's risk and expense, and the master and owners discharged from all responsibility."
(c) "With liberty (in event of steamer putting back to this or into any other port or otherwise being prevented from any acts from commencing or proceeding in the ordinary course of her voyage) to ship or transship the goods by any other steamer."
(e) "With liberty either before or after proceeding towards the port of discharge to proceed to and stay at any port or place whatsoever."

The above four libels were filed June 4 to June 7, 1898, a few days after the arrival of the ship in New York. They allege the shipment under the bills of lading, their indorsement to the libelants, the loading of the cargo, the demand for the delivery of the goods at New York, the refusal to deliver and the consequent damage to the amount of the value of the sulphur. Two of the libels allege a conversion of it. The answers were interposed on the following December 1st. In the meantime an agreement by stipulation had been made between the parties, providing that the claimant should forward the brimstone from Empedocle upon the first available steamer to New York, and deliver it to the consignees on the terms for freight as specified in the bills of lading; and that the consignees should pay the agreed freight on delivery; that the goods on arrival should be sold at current market rates, and the proceeds of the goods less charges incurred, be credited on account of the damages, if any, recovered by the libelants; that the respondents should have a lien on the brimstone for the charges against it in Sicily, provided the respondent was justified in relanding and storing it there as was done; if not justified, then the brimstone should be freed from any such charges or expenses except freight. Under this agreement the respondent again caused the brimstone to be loaded and brought to New York by the Abazzia, one of its vessels, in August and September, 1898, after paying all the expenses in Sicily, and delivered the sulphur for sale under the agreement, whereupon it was sold, netting about the amount of the invoice

prices, and on some of the consignments more than the invoice price, not counting the freight.

The respondent in its answers to the above libels sets up the agreement last named; the payment of the net proceeds to the libelants; that the net proceeds exceeded the invoice price; that the libelants had sustained no damages recoverable against the respondent under the following stipulation in the bill of lading,

"The shipowner is not to be liable * * * in any case for more than the invoiced or declared value of the goods, which ever shall be the least;"

and that the discharge and storage of the sulphur at Empedocle was justifiable under the provisions of the bill of lading and the acts and circumstances of war.

The owner of the Styria also filed four cross libels against the above libelants for the recovery of the expenses incurred at Sicily in the discharge and storage of the sulphur upon the same ground pleaded in its answers to the original libels.

1. Though exceptions (a) and (b) above noted in the bill of lading contemplate circumstances of war and are therefore applicable in the extraordinary circumstances that arose, still the carrier is not thereby relieved from the duty of acting with reasonable prudence for the interests of all concerned. The master as the agent of all concerned is still bound to a prudent regard for the interests of the cargo, and "must endeavor to hold the balance evenly" between ship and cargo, when their interests conflict. The Julia Blake, 107 U. S. 418, 427, 428, 431, 2 Sup. Ct. 692; The Spartan, 25 Fed. 44, 56–58; The L'Amerique, 35 Fed. 844, 845; Cargo ex Argos, L. R. 5 P. C. 134, 165; Nobel v. Jenkins [1896] 2 Q. B. 326, 331, 332.

The sulphur being generally regarded as contraband of war, and also within the express terms of the Spanish proclamation, a voyage through the Mediterranean, past the coast of Spain and through the Straits of Gibraltar, would presumably be peculiarly dangerous to the cargo, even though the vessel, as a neutral, might not be liable to condemnation as prize. In case of seizure, however, the shipowner would suffer from the considerable delay incident to the seizure though she were ultimately released. Except, therefore, for the negotiations immediately entered on for procuring an exception of sulphur from contraband, I have no doubt that it would have been both the right and the duty of the master for the interests of the cargo as well as of the ship, to refuse to sail with this cargo after clearing on April 24th until there was some reasonable assurance of safety. See The San Roman, L. R. 3 Adm. & Ecc. 583, where there was a delay of three months. The discharge and storage of the cargo, however, was an act necessarily involving considerable expense to the shipper or consignee; and before imposing such an expense upon the cargo, the master in my judgment was bound in view of the daily reports of current negotiations and the expectations of the exception of sulphur, to wait a reasonable period for satisfactory assurances in that regard. No doubt any delay entailed some loss upon the ship, and what should be deemed a reasonable period ought to be determined with reference to the circumstances and interests of both. But taking the circumstances altogether, I am of opinion that the commencement

of the discharge on the 27th was too hasty and precipitate; and that the master was guided in that matter by the telegram from Burrill & Son, the managing agents in London, rather than by his own judgment on all the circumstances known to him at the time. Had he been left to exercise his own judgment, I do not think, upon the testimony, that he would have discharged the cargo,—certainly not at the time he did; and that before he left Italy, although there was no formal publication of the exception of sulphur, there were such informal assurances coming from the Spanish government as left no reasonable apprehension of danger from sailing with a sulphur cargo.

I must find, therefore, that the ship was not justified by clauses (a) and (b) of the bill of lading above quoted in discharging and storing the cargo on account of the shippers, as she did, between April 27th and May 7th; that by the 10th of May there was reasonable assurance that it would be safe to go on with the voyage, and that this was not an unreasonable time for the ship to wait under the facts and circumstances currently known in Sicily at that time. In Nobel v. Jenkins, supra, the facts were otherwise.

2. The defendant also invokes the liberty to transship under clause (c) of the bill of lading above quoted. This is a clause which is no doubt designed for the benefit of the ship alone, in any emergencies that might call for the exercise of the option given. That clause might perhaps have been applicable in the present case, though without advantage in the result to the defendant, since the defendant would under this clause alone stand chargeable with all the expenses of discharge, storage and reloading. It was doubtful how long the vessel might be detained before it could be ascertained and determined whether a contraband cargo could be carried with a reasonable prospect of safety or not. The ship may, therefore, have had the option under this clause, in conjunction with clauses (a) and (b) above referred to, to discharge the cargo immediately and store it, as she did, rather than incur a certain loss by detention of the vessel for a more or less indefinite period while waiting until it was found safe to proceed; and while thus discharging at once, she might leave it to the chances of future events to determine against which interest, whether of ship or cargo, the expenses should be charged. If the result should show that the vessel would have been detained an unreasonable time before she could have safely sailed, then the expense would properly fall on the cargo, because the discharge would have been justified by the danger clauses (a) and (b); but if, on the other hand, it should turn out that the vessel might have safely sailed within a reasonable time, having due reference to the interests of both ship and cargo, then the discharge could not be justified under clause (b), but under clause (c) alone; and any such transshipment being at her own option and for her own convenience, all the expenses of discharge, storage and reshipment would fall upon the ship, as in any other case of a transfer and reshipment under clause (c).

In this case, however, the discharge was stated by the master at the time to be based upon his rights under clauses (a) and (b) only; and the various clauses of the agreement subsequently made between the

parties, under which the cargo was brought forward, seem based upon the same assumption.

3. The stipulation in the bill of lading, that the shipowner "is not to be liable in any case for more than the invoiced or declared value" of the goods, does not mean that the consignees shall pay freight in addition to the loss of the invoice price; but under the agreement with the parties for forwarding the cargo to New York, I think that the consignees are entitled to deduct the freight paid by them from the gross proceeds of the sale of the brimstone, as a part of the expenses of realizing the moneys derived from it.

Decrees may be entered in accordance with the above findings; and if the parties cannot agree as respects the net proceeds and the invoice price, a reference may be taken in each case to adjust the same.